E. DILLINGHAM, INC. *v.* UNITED STATES

Court Nos. 62/15969, etc.

(Decided June 24, 1975)

*Allerton deC. Tompkins* for the plaintiff.

*Rex E. Lee*, Assistant Attorney General (*Herbert P. Larsen*, trial attorney), for the defendant.

FORD, Judge: The merchandise at bar consists of various molds used with the Bata Monoplax Atlas Unit (hereinafter called the Bata Monoplax) for the production of footwear. The molds were imported from Canada during the years 1959–1963 and were assessed with duty under paragraph 353, Tariff Act of 1930, as modified, as parts of articles having as an essential feature an electrical element or device, and are claimed to be free of duty under paragraph 1643, as shoe machinery, in whole or in part.

The pertinent provisions of the tariff act are as follows:

Classification:

Paragraph 353, Tariff Act of 1930, as modified by Presidential Proclamations 2929, 3468, and 3479:

> Articles having as an essential feature an electrical element or device, such as electric motors, * * * finished or unfinished, wholly or in chief value of metal, and not specially provided for:
>
>     *     *     *     *     *     *     *
>
>     Other (except * * *)_____ 13¾% ad val.
>       [Effective July 1, 1962]_____ 12½% ad val.
> Parts, finished or unfinished, wholly or in chief value of metal, not specially provided for, of articles provided for in any item 353 of this Part (not including X-ray tubes or parts thereof)_____ The same rate of duty as the articles of which they are parts.

Claim:

> Paragraph 1643, Tariff Act of 1930, as amended:
>
> Linotype * * * machines, shoe machinery, * * * all the foregoing whether in whole or in part, including repair parts.         [Free]

The complaint covers 12 protests, consolidated for trial under the caption *Bata Shoe Co., Inc., et al.* v. *United States*, Court No. 61/5029. At the trial plaintiff abandoned Court Nos. 61/5029 and 63/4482 and the action was recaptioned as shown above. It further appears that 10 entries listed in the complaint under Court No. 62/18754 are in fact covered by Court No. 62/18755. At the trial plaintiff further limited its claim to the protests and entries listed on exhibit 14. Accordingly, this action is dismissed as to all entries not listed on exhibit 14, a copy of which is annexed hereto.

Defendant claims in addition that the merchandise covered by entry No. 0–1062 of Court No. 65/19813 was not placed in issue by the pleadings and that the action should be dismissed as to said entry. An examination of the entry papers reveals that the imported molds, which had been repaired abroad, were assessed with duty on the cost of repairs under paragraph 353, *supra*, and paragraph 1615, Tariff Act of 1930, as amended. The latter provides in subsection (g)(1) that any articles exported for repairs may be returned upon payment of duty upon the value of the repairs at the rate or rates which would apply to the article itself. The entry papers, the protest, and the complaint are sufficient to bring the merchandise and the issue before the court. *The Rubberset Company et al.* v. *United States*, 68 Cust. Ct. 370, C.R.D. 72–9, 342 F. Supp. 749 (1972); *Ehrenreich Photo Optical Industries, Inc.* v. *United States*, 71 Cust. Ct. 257, C.R.D. 73–18 (1973).

There was incorporated in this action the record in the case of *E. Dillingham, Inc.* v. *United States*, 65 Cust. Ct. 224, C.D. 4082 (1970), which in turn incorporated the record in *E. Dillingham, Inc.* v. *United States*, 56 Cust. Ct. 392, C.D. 2664 (1966), *aff'd*, 54 CCPA 121, C.A.D. 922 (1967).

The earlier *Dillingham* case involved the classification of the Bata Monoplax machine itself, whereas the later case related to a mold designed for use with the Bata Monoplax to produce an overshoe known as the Susan Boot. The instant case involves molds for the Bata Monoplax, for use in the production of footwear, including the Susan Boot.

In both the prior cases it was claimed the Bata Monoplax was chiefly used for the production of shoes and that the machine or the molds therefor were entitled to free entry under paragraph 1643. In neither case was plaintiff's claim sustained. In the earlier case, the Court of Customs and Patent Appeals stated (54 CCPA 121, 123–125):

> The Customs Court found that for an article to fall within the provisions for shoe machinery as contained in paragraph 1643 of the statute it must be chiefly used in a manufacturing operation upon shoes. Further, such chief use must be established by posi-

tive testimony with respect to merchandise of the same class or kind. *L. Tobert Co., Inc., American Shipping Co.* v. *United States*, 41 CCPA 161, C.A.D. 544; *United States* v. *Spreckels Creameries, Inc.*, 17 CCPA 400, T.D. 43835. The Customs Court then concluded that Mr. Bara was not sufficiently qualified to testify as to the chief use of the imported merchandise, * * *

  *      *      *      *      *      *      *

We are in agreement with the decision of the court below.

  *      *      *      *      *      *      *

It is well established that the collector's classification is presumed to be correct, *F. H. Kaysing* v. *United States*, 49 CCPA 69, C.A.D. 798, and that the burden of proving chief use of the imported merchandise is on the importer who protests the classification of the collector, *United States* v. *Bruce Duncan Co., Inc.*, 50 CCPA 43, C.A.D. 817. In the present case appellant has entirely failed to establish any chief use for the merchandise in question. We find the testimony of Mr. Bara is without substantial probative value with respect to the question of chief use. For all we know, the imported machinery may be used in any manufacturing operation where molding is one step. * * *

The fact that the imported article is being used in the manufacture of shoes is insufficient to establish chief use. * * *

In the later case (65 Cust. Ct. 224), this court found the Bata Monoplax was a slush molding machine but that the evidence did not establish that it belonged to a class or kind of slush molding machinery that was chiefly used as shoe machinery. The court consulted a number of authorities on plastics and their production and concluded (p. 229):

It is evident that slush molding is not limited to the production of footwear. Therefore, to establish that the Bata monoplax unit belongs to a class of merchandise chiefly used as shoe machinery, it would have to be shown that there is a kind of slush molding machinery which is chiefly used as shoe machinery and that the Bata monoplax unit belongs to that class. Such evidence is lacking in the instant case. The witnesses were familiar only with machinery used in the footwear industry and could make no comparison with slush molding machinery used for general purposes. While they knew of no use of the Bata monoplax unit for the manufacture of articles other than footwear, it may well be that it could be so used. According to the record, it can produce different types of footwear with the use of different molds and some adjustment of the machinery. It is therefore reasonable to assume that the Bata unit itself could be adapted to the production of other slush molded articles.

The instant case was initiated in an effort to supply evidence found to be lacking or insufficient in the two prior cases. In support of its position plaintiff called two witnesses, Loren Waddell, assistant chief engineer of the Bata Shoe Company, and George Hollington, project development manager for new processes and techniques of that com-

pany, and introduced exhibits depicting the various types of footwear produced from the imported molds (exhibits 1–13, 15); a mold and mold holder riveted together (exhibit 16), and the Bata Monoplax machine in various stages of operation (exhibits 17–19).

Mr. Hollington, plaintiff's principal witness on the issues at bar, is a graduate of the National School of Rubber Technology and of the Plastics Institute, both located in London. He is a fellow of the Boot and Shoe Institution and an associate of the Institution of Rubber Industry, and has written several books on footwear technology. He has been with the Bata organization for 40 years, starting in 1934 when he went to Czechoslovakia to train as a rubber shoe technologist. He also served in England and India for Bata. In 1973, he came to the United States for Bata as project development manager for new processes. This was subsequent to the importations before the court.

The following description of the Bata Monoplax and its method of operation is derived from the testimony in this case and the prior cases of Mr. Hollington and Charles Bara, Jr., assistant plant engineer of Bata's Belcamp, Maryland plant.

The Bata Monoplax is an oval-shaped unit approximately 100 feet long, having a conveyor belt to which 86 shoe mold holders may be attached. Shoe molds are permanently affixed to the holders which are designed to fit the carriage so that they can be changed easily in order to produce footwear in different sizes and models. The footwear is made from a thermoplastic material called plastisol, consisting of polyvinyl chloride, a plasticizer, and other ingredients. Different formulae are used in accordance with the particular product desired.

At the start of the operation, plastisol is poured into the shoe mold to fill it partially. The mold is then tipped into a toe-down position and is rocked in four different directions in order to let the air escape and prevent air bubbles from being trapped in the materials. Then the mold is returned to a sole-down position and filled completely with the same material. Heat is applied to the bottom of the soles of the shoe molds. This starts the jelling or building up of the material inside the mold. As the shoe mold continues around the unit, more heat is applied to the side of the shoe so the building up operation can start there. When the shoe has sufficient thickness built up inside the mold, the mold is inverted to the sole-up position, which allows the excess material to be drained out. The mold continues around the unit and is carried through a fusing oven. After the article is fused, it is carried through a cooling station and is subjected to a stream of air and water which cools the mold and the shoe which is being formed inside the mold. This allows the shoe to spring and enables the operator

to pull it out of the mold with the help of air pressure. The molds remain on the carrier and the cycle starts again.

The Bata Monoplax has four different filling stations and a unit called the flocking unit, the purpose of which is to insert a powderlike form which will stick to the material being jelled and give to the shoe the impression of being lined. The molds are specifically designed for use with the Bata Monoplax and cannot be used with any other apparatus.

The witness Hollington stressed that the Bata Monoplax has several pouring and filling stations; that with footwear it is necessary to make provision for forming two skins or three different types of plastisol materials, having varying hardnesses, colors, and flexibilities, and that it must be possible to build up the skin in areas where it is needed, such as for soles and heels. This could not be done according to the witness in any other way than by pouring, tipping out, refilling and tipping out, which is the Monoplax process. Mr. Kotek, a machinery development engineer of the Bata organization, testified in the second *Dillingham* case (65 Cust. Ct. 224) that for building up the hard substance of the sole and heel it is necessary that more heat be put on the molds. Mr. Bara also stated that building a shoe in proper thicknesses requires changes in the application of heat.

According to Mr. Hollington, there are two classes of machinery in which plastisols and slush molding processes are or were used. One is a rotational molding or casting process and the other a pouring process. In the former, which came into operation in 1951, a specific amount of material is placed in the mold and it is rotated to create a centrifugal force so that a uniform skin is formed inside the mold. After heating the mold, causing a solidification of the plastisol, the mold is opened in two halves and the article extracted. This method is still in use and is employed to produce balls, dolls, and toys.

The slush molding pour method was developed in London in 1955, 1956, and 1957. The witness agreed with the following description of that method, which was read to him by defendant's counsel from the *Plastics Engineering Handbook* of the Society of the Plastics Industry, Inc. (p. 311).

> * * * molds are placed on a conveyor belt having positions for as many molds as desired. The vinyl plastisol is poured into a mold until it is filled to the top. This mold, on the conveyor belt, is carried through an oven where temperatures between 210° and 600° Fahrenheit jell the plastisol next to the wall of the mold. The thickness of this jelled plastisol at a given oven temperature is determined by several factors, such as the thickness of the metal wall of the mold, the length of time the mold is in the oven, and the jelling characteristics of the plastisol used. The mold is now turned upside down, and the plastisol remaining in liquid form is

dumped out, while the semi-fused material next to the wall remains in place. The mold is then carried to the second oven, where the coating is completely fused. Passage through a cooling chamber cools the mold sufficiently to permit removal of the finished piece by blowing it out with compressed air or collapsing it with vacuum. * * *

The witness agreed that this was a fair description of the process Bata uses except that it could be used for articles other than shoes. He also testified that slush molding processes of the pouring type were used during the period 1957–1961 to produce toys, such as dolls and animals. According to the witness, this method has been replaced by new and more efficient techniques, such as blow molding. He distinguished the slush molding machines used to produce toys from the Bata Monoplax as follows:

Those machines were strictly constructed for single pouring techniques, whereas the monoplax unit on which we produce footwear is designed to produce a variety of pouring systems. On the original toy slush molded machines, only single skin formations in the product could be made.

    *      *      *      *      *      *      *

If I want to produce an article by slush molding, first I have to determine what type of article it is. If it is a toy, than I would need a single pouring system; whereas, if I was producing footwear, then I would have to design the equipment for several station pourings and dumpings, of course. This is the main difference. Otherwise, the technique of slush molding is as was described to me on the script by this gentleman there.

Mr. Hollington stated that the slush molding machines using the pouring method, other than the Bata Monoplax, had a single filling station and the product had a single skin of a certain specific substance, determined by the heat and the time during which the mold went through the oven. In this opinion, it was not commercially feasible to adapt the Bata Monoplax to the production of articles other than footwear. He had never known of any other article produced with the Bata Monoplax. Mr. Hollington testified that it could not be used for other manufacturing operations where molding was one step in the operation. To his knowledge, there was no slush molding pour-type machine in the United States in 1959–1963 similar to the Bata Monoplax.

For the imported merchandise to be classified as parts of shoe machinery, it must be established that the Bata Monoplax belongs to a class or kind of merchandise chiefly used in the production of shoes. Since it is not disputed that the Bata Monoplax is a slush molding machine and is used in the production of footwear, the issues are narrowed to (1) whether the Bata Monoplax is a special kind of slush

molding pour-type machinery in a class by itself, particularly adapted and used for the production of footwear, and (2) if so, whether it constitutes shoe machinery for tariff purposes, in view of the fact that it is used to produce boots and overshoes, as well as shoes.

Plaintiff relies on *Converse Rubber Co.* v. *United States*, 69 Cust. Ct. 55, C.D. 4374 (1972). That case involved a multiple station rotary table injection molding machine used in the manufacture of soles for sneakers. Four types of injection molding machines were identified and their processes and uses described. The court noted that while all the machines contained a press section, place to mount the mold, a clamp to hold it, and an injection end which prepared the material for injection in a mold, they were economically suited for different types of operation. Efforts had been made to sell the imported machine to gasket and gear manufacturing companies and those making floormats, scales, etc., but those efforts had been unsuccessful because of the small size of the platen. The platen was, however, uniquely suited for the production of shoe soles. The court concluded (p. 58):

> * * * While defendant's exhibit A depicts various uses other than shoes, the present record establishes that by virtue of the small size of the platen, the production for all practical purposes of these items is economically unfeasible except for the manufacture of soles for shoes. The question of economics appears to be a determining factor as to which type of molding machine will be used in a particular industry. Accordingly, we feel the multiple station rotary press is a class or kind unto itself. The use or operation of a rotary machine is not any more similar to the horizontal, vertical or shuttle type press than is a motorcycle to an automobile. While the Desma machine belongs to the broad class of injection molding machines, it is not a general purpose machine, according to the record, but it is a specialized machine particularly adapted for and used in the manufacture of shoes. *United States* v. *Hudson Shipping Co., Inc., et al.*, 49 CCPA 92, 96, C.A.D. 802 (1962).

In the instant case, while Mr. Hollington agreed that the Bata Monoplax was a slush molding machine of the pour type, he attempted to distinguish it from other slush molding machines on the basis that they had only one pouring station while the Bata Monoplax had several and was designed and used only for the production of footwear. Mr. Hollington's testimony in this regard is not conclusive, however, in view of the following: His entire experience, except for a period during the war, was with the Bata organization, whose business is the manufacture of footwear. He was employed in Czechoslovakia, the United Kingdom, and India and did not come to the United States until 1973. He was not in the United States during the period covered by these importations. While the witness testified he had attended seminars and technical conferences here before becoming a resident,

there is no evidence as to the dates of the conferences nor the topics covered. He said he had visited plants where products other than footwear were produced on slush molding machines, but did not mention any plant, city or state within the United States where he had made observations nor the brand name of any slush molding machine he had seen. The witness apparently had no knowledge of any slush molding machine using the double-pour system, hereinafter mentioned.

That Mr. Hollington was unfamiliar with slush molding machines in the United States, even those producing footwear, is further indicated by his lack of knowledge of the merchandise involved in *W. A. Gleeson* v. *United States*, 58 CCPA 17, C.A.D. 998, 432 F. 2d 1403 (1970). That merchandise was described as rebuilt equipment for slush molding plastic footwear, was manufactured by British Rubber Co. in Canada, and imported in 1957 for Converse Rubber Co. The court described the machine as "made up of a series of eight stations, which include a preheating oven, a station where liquid plastic is poured into a mold, a heating table, a gelling oven, a drying table, a flocking station, and a fusing oven." In that case the court held the evidence insufficient to establish that the merchandise was of a class or kind chiefly used in a shoe manufacturing operation, since chief use "envisions use by users, as a whole, of the type of commodity involved, and not merely individual use of the particular shipment in question."

In none of the cases involving the Bata Monoplax were witnesses called who had actual experience outside the Bata organization or with slush molding machines other than the Bata Monoplax. Therefore, in order to compare the Bata Monoplax with other slush molding equipment, the court must turn to authoritative literature on the subject.

According to the authorities, there are a number of methods of plastisol molding, including rotational molding and slush molding. *Modern Plastics Encyclopedia*, 1966; DuBois & John, *Plastics*, 1967.

In discussing slush molding in the *Modern Plastics Encyclopedia*, 1966, and prior editions, it is pointed out that most of the production lines using slush molding follow one of two basic systems: single-pour or double-pour, both of which are readily adapted to conveyorized lines. The double-pour system is described as follows (pp. 847–850):

> *In the two-pour method,* the cold mold is filled, usually by gravity or by pumping, and vibrated to remove bubbles. It is then dumped, leaving a thin film of plastisol on the surface. By filling a cold mold in this manner there is less chance of entrapping air or of any possible gelation taking place over fine details at the extremities.

After dumping and draining, the mold is passed through an infra-red or hot-air oven to fuse or semi-fuse the first skin. After passing through the first pour oven, the mold is filled a second time, dumped, and allowed to drain. The length of time the mold is in the first oven determines the wall thickness of the final part because the heat of the mold retained from the setting or fusing of the first skin will determine the ultimate thickness of plastisol deposited on the walls of the mold. The mold is then passed through a second oven for final fusing of the plastisol part and is cooled and stripped.

Sponge plastisol may be similarly handled when items such as boot socks and toys are manufactured completely of sponge. When a plastisol skin-sponge combination is desired, a two-pour system is used, with sponge vinyl plastisol poured in the second step.

Similar descriptions appear in DuBois & John, *op. cit.*, and the *Plastics Engineering Handbook*. The latter includes illustrations of typical slush-molded articles, these being dolls and doll parts.

A comparison of the descriptions of slush molding machinery of the two-pour type with the testimony regarding the Bata Monoplax indicates that the latter is a more sophisticated version of the former, with additional pouring stations. The method of operation of the two are comparable. While the Bata Monoplax was designed for and used in the production of footwear by the Bata organization, there is no evidence that anyone ever tried, successfully or unsuccessfully, to use the machine for the production of other articles or that it was offered for sale to firms making other products. The Bata organization evidently kept the machine for its own use and that use was in the manufacture of footwear.

The evidence does not establish that the Bata Monoplax is so distinct from other slush molding machinery of the double-pour type as to constitute a separate class, nor has it been shown that it would be practically or economically unfeasible to use it, with some adaptation, for the production of articles other than footwear. According to Mr. Hollington, slush molding pour-type machines would be constructed somewhat differently in order to produce the particular articles desired. In *Plastics Engineering Handbook*, it is stated (p. 311):

> * * * There are many different designs of slush-molding machinery. The design will depend on the end product. The methods of slush-molding are being constantly improved and mechanized. * * *

This case is distinguishable from *Converse Rubber Co.* v. *United States, supra,* wherein it was shown that there were several kinds of injection molding machines, each suitable for different purposes; that

the rotary type was especially suited to the manufacture of shoe soles because of the small size of the platen, and that efforts had been made, unsuccessfully, to sell it to manufacturers of other merchandise. No such showing has been made here.

The court, therefore, concludes that while the Bata Monoplax may be an improved kind of slush molding pour-type machine, it has not been established that it is a special kind of slush molding pour-type machinery in a class by itself. Mr. Hollington testified that the adaptation of slush molding machinery for use in the production of footwear required only a change in pouring and filling stations and that the technique was the same. Since there is no proof that slush molding pour-type machinery was chiefly used in the manufacture of shoes at the time of these importations, plaintiff's claim cannot be sustained.

Accordingly, the action is dismissed and judgment will be entered for the defendant.